UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-22861-CIV-LENARD/GARBER

**PALMETTO EXPRESSWAY**
**OUTDOOR, LLC,**

    Plaintiff,
v.

**CITY OF MIAMI GARDENS,**

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT
## (D.E. 6)

**THIS CAUSE** is before the Court on Defendant City of Miami Gardens' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion," D.E. 6), filed on October 15, 2009. On November 23, 2009, Plaintiff Palmetto Expressway Outdoor, LLC, filed its response in opposition ("Response," D.E. 12), to which Defendant filed its reply ("Reply," D.E. 16), on December 23, 2009. On July 2, 2010, Defendant also filed a Notice of Filing of Disposition of Related Action ("Notice," D.E. 33). Having considered the Motion, Response, Reply, related pleadings, and the record, the Court finds as follows.

    **I.**    **Background**

On September 24, 2009, Plaintiff Palmetto Expressway Outdoor, LLC ("Palmetto") filed its complaint ("Complaint," D.E. 1), seeking injunctive and other relief pertaining to Defendant City of Miami Gardens' ("Miami Gardens") denial of its applications for permits

to construct outdoor billboard signs.[1] Palmetto is a business engaged in selling outdoor advertising. (Complaint at ¶ 8.) It seeks to erect billboard structures on private property within Miami Gardens and has leased certain properties in order to do so. (Id. at ¶¶ 8-9.)

On January 24, 2007, Miami Gardens passed Ordinance No. 2007-05-111, (the "Billboard Ban") banning billboards and other off-premises signs. (Id. at ¶ 10.) The Billboard Ban raises Miami Gardens' concern that "an uncontrolled proliferation of off-premises signs (Billboards) within Miami Gardens would result in a negative visual impact" and adopts a series of regulations "in order to maintain and improve the aesthetics, quality of life, and safety of the City and its residents." (Id. at Ex. A, D.E. 1 at 19.) The Billboard Ban states, "it shall be unlawful for any person to erect, place or use within the City, any Class C, Off-premise or Billboard sign, and no new Class C, Off-premise or Billboard sign shall be erected within the corporate limits of the City." (Id. at 24.)

The Complaint asserts a number of claims challenging Miami Gardens' regulations and their enforcement. The Complaint alleges: (1) the Billboard Ban is unconstitutional; (2) the denial of Palmetto's applications in reliance on inapplicable sign standards for monument signs, window signs, and wall signs, is unconstitutional; (3) the exclusion of certain signs from the permitting requirements based upon their content is unconstitutional; (4) the

---

[1]   Miami Gardens denied Palmetto's applications for permits for various reasons (some not applicable to all) including the fact that the proposed signs did not meet the City of Miami Gardens Sign Regulations' (attached as Ex. D to Plaintiff's Complaint and hereafter "Sign Code"), design standards, sign area and height standards, changeable copy area standards, size standards, and because of the prohibition on billboard signs. (See Ex. D to Complaint, D.E. 1-1 at 34-67.)

2

requirement that entities submit a sign plan to Miami Gardens is an impermissible prior restraint on speech; (5) the requirement that entities seek pre-approval from Miami Gardens is an impermissible prior restraint on speech; (6) the lack of a time period for approval of sign plans is an impermissible prior restraint on speech; and (7) the Miami Gardens' legislative action in approving the regulations violate Palmetto's rights to substantive due process. The Complaint asserts Palmetto possesses standing to sue because it challenges the "constitutionality of the Billboard Ban, the Sign Plan requirement of Sign Code Section VII, the Sign Code, as well as any other provision which was or could have been used to deny the Applications." (Id. at ¶ 51.) Furthermore, the Complaint states, "[i]f the Court declares the Billboard Ban, the Sign Plan requirement, the Sign Code, and/or any other provision which was or could have been used to deny the applications, Palmetto would be entitled to erect the Proposed Signs." (Id. at ¶ 54.) Miami Gardens moves to dismiss Palmetto's Complaint.

**II.     Motion to Dismiss**

Miami Gardens moves to dismiss the Complaint for lack of subject matter jurisdiction on the grounds that Count II fails to state a claim for relief and Palmetto lacks standing because it cannot establish its alleged injury would be adequately redressed by judgment in its favor. Specifically, Miami Gardens argues that the requested signs violate (1) the maximum limit for total sign area of 150 square feet for any sign within Miami Gardens pursuant to Sign Code regulations chapters X(1)(2) and XI(A)(2) (see D.E. 1-1 at 20, 23.), (2) the maximum sign height of 20 feet for any sign within Miami Gardens pursuant to Sign

3

Code regulations chapter X(1)(3) (see D.E. 1-1 at 20.), and (3) the requirement that a minimum of eighty percent of the base supporting structure be in contact with the ground for any free-standing sign within Miami Gardens pursuant to Sign Code regulations chapter IX(B)(1)(c). Accordingly, because Palmetto's applications for sign permits could have been denied on several alternative grounds (that Miami Gardens says cannot or have not been legitimately challenged) Palmetto's alleged injuries would not be redressed even if it obtained judgment in its favor in this litigation. Therefore, Miami Gardens believes Count II fails and Palmetto lacks standing to raise any of its additional claims.

In response, Palmetto argues the Sign Code does not contain size and height limitations pertaining to all signs. Rather, Palmetto argues that Count II of its Complaint properly raises its claim that Miami Gardens misapplied various code requirements pertaining to different kinds of signs in improperly denying its permits. For example, chapter X and XI's limitations regarding total sign area and chapter X's limitation regarding total sign height only apply to "monument signs."[2] Also, chapter IX's restriction that a minimum of eighty percent of the base supporting structure be in contact with the ground only applies to

---

[2] The Sign Code defines a "monument sign" as "[a] freestanding sign where the supporting structure of the sign face is architecturally and aesthetically integrated into the overall design of the sign. The base of supporting structure is embellished to conceal all structural or support members. The perimeter of said sign is landscaped to enhance the area adjacent to the sign. Eighty percent (80%) of the base supporting structure shall be in contact with the ground. The sign face should be solid and not intended to be a pole type design." Sign Code Ch. IV (D.E. 1 at 66.)

"monument signs." Palmetto admits that it was attempting to construct "pole signs"[3] and not "monument signs." Palmetto further argues that pole signs are permitted under the Sign Code's "catchall provision," or chapter V(D), which reads:

> **V. SIGN PERMIT REQUIRED**
>
> \*\*\*
>
> D) **Permitted and Prohibited Signs, General Statement**. Signs that are specifically identified, defined, listed and/or otherwise authorized by this schedule shall be permitted as set forth herein. Signs that are not specifically defined, identified, listed and/or otherwise authorized shall be prohibited.

(Sign Code Ch. V(D), D.E. 1 at 71.) Palmetto contends Miami Gardens' misapplication of the Sign Code violates the First and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 4, and 9 of the Florida Constitution. Therefore, Palmetto believes it has challenged the alternative reasons offered by Miami Gardens in denying its permit applications. Additionally, Palmetto points to a paragraph in its Complaint which generically states its challenge to "any other provision which was or could have been used to deny the Applications." (Complaint at ¶ 51.)

In reply, Miami Gardens argues that Palmetto's proposed plans to construct pole signs are impermissible because of the additional reason that they are not within chapter IX's permissible design standards. Chapter IX of the Sign Code begins with the premise that, "[t]he following design standards shall be applied and complied within [sic] the design of all

---

[3] The Sign Code defines a "pole sign" as "[a] permanent sign erected, supported, mounted on a pole or poles which is wholly independent of any building or other structure for support." Sign Code Ch. IV (D.E. 1 at 67.)

5

signs, unless specifically set forth differently in this Schedule." Chapter IX then sets out different standards for monument signs (chapter IX(A)-(B)), wall signs (chapter IX(C)-(E)), directional/information signs (chapter IX(F)), window signs (chapter IX(G)), entrance feature signs (chapter IX(H)), directory signs (chapter IX(I)), flags (chapter IX(J)), memorial signs (chapter IX(K)), gasoline service stations signs (chapter IX(L)), signs for theaters, playhouses, and other similar cultural or civic establishments (chapter IX(M)), and drive-thru menu board signs (chapter IX(N)). (D.E. 1-1 at 2-18.) Because "pole sign" is defined in the Sign Code, but not part of the acceptable design standards section, Miami Gardens argues pole signs are not permitted and the applications could have been denied on that basis. Miami Gardens argues that the "catchall provision" specifically only permits those signs that are "permitted as set forth herein." (Sign Code Ch. 5(D), D.E. 1 at 71.) Miami Gardens also looks to chapter XIV of the Sign Code for support. That chapter provides:

> XIV.  **PROHIBITED SIGNS**
> ***
> . . . the following signs shall be prohibited in the City of Miami Gardens;
> ***
> (1) Any sign not in compliance with the standards set forth in this Schedule.

(D.E. 1-1 at 31-32.) As a result, Palmetto's applications for pole signs would have been denied as not within the design standards allowed under the Sign Code. Since Palmetto has not specifically challenged Miami Gardens' failure to authorize pole signs, Miami Gardens argues it lacks redress and therefore standing.

On July 2, 2010, Miami Gardens filed its Notice, attaching another decision in this

District dealing with a challenge to Miami Gardens' Sign Code and Billboard Ban, <u>Miami Metro Media, LLC v. City of Miami Gardens</u>, 2010 WL 2634432 (S.D. Fla. June 30, 2010) (Moreno, C.J.). In that case, an outdoor advertising company applied for permits to erect billboard signs. The city of Miami Gardens denied those applications based upon its Billboard Ban and other deficiencies under the Sign Code. On Miami Gardens' motion for summary judgment, that court did not agree with the city's arguments that the size limitations found within various subsections of the Sign Code could be construed to apply to any and every sign within the city. <u>Id.</u> at *4. The court noted how the city plucked various provisions relating to different type and design signs and applied them to the proposed signs. (<u>Id.</u>) Nevertheless, the court in <u>Miami Metro Media</u> found that:

> On the other hand, the Sign Code makes clear that only the types of signs expressly authorized are permitted, and it goes to great lengths to list and describe the specific types and designs of signs that are permitted. But the type and design of sign that Miami Metro Media seeks to erect–a freestanding sign supported by a pole–is simply not authorized by the Sign Code. Thus, even if Miami Metro Media were correct that the billboard ban is unconstitutional, it still would not be able to erect its signs. It would be different if the signs Miami Metro Media seeks to erect were of a type or design authorized by the Sign Code or if Miami Metro Media challenged the Sign Code's prohibition on the type or design of the signs it seeks to erect. But that is not the case.

<u>Id.</u> Accordingly, the court in <u>Miami Metro Media</u> found the plaintiff lacked standing to challenge the Sign Code's other provisions based on a lack of redressability.

### III.     Discussion

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a

complaint based on a lack of subject-matter jurisdiction. The Court's first inquiry is whether subject matter jurisdiction exists and this inquiry should be undertaken at the earliest possible stage. See Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 2000).

Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies. Fla. Family Policy Council v. Freeman, 561 F.3d 1246, 1253 (11th Cir. 2009). The doctrines of "[s]tanding and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute" and originate from Article III's "case and controversy" requirement. Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006). In order to possess standing, three elements must be present: "(1) the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Freeman, 561 F.3d at 1253 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Pittman v. Cole, 267 F.3d 1269, 1282 (11th Cir. 2001)). Plaintiffs bear the burden of proving each of these three elements. 31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir. 2003).

The Eleventh Circuit has held that "a plaintiff whose sign permit applications were

denied on the basis of one provision in a county's sign ordinance, but which could have been denied on the basis of some alternate, but unchallenged regulation, does not have a redressable injury."  Maverick Media Group, Inc. v. Hillsborough County, Fla., 528 F.3d 817, 820 (11th Cir. 2008) (citing KH Outdoor, L.L.C. v. Clay County, Fla., 482 F.3d 1299, 1301 (11th Cir. 2007)).

This case is nearly identical to the situation in Miami Metro Media.  Palmetto is attempting to challenge various provisions of the Sign Code, including the Billboard Ban, and construct several pole signs within Miami Gardens.  Palmetto admits it is attempting to construct pole signs.  The Complaint explicitly states, "[e]ach of the Applications includes a proposed single pole sign structure." (Complaint at ¶ 41.)  Palmetto contends, "[p]ole signs are in fact allowed to be erected within the City." (Response at 8.)  However, as the court in Miami Metro Media determined, "the type and design of sign that Miami Metro Media seeks to erect–a freestanding sign supported by a pole–is simply not authorized by the Sign Code."  2010 WL 2634432 at *4.  The Court agrees that pole signs are not authorized by Miami Gardens' Sign Code.  Chapter IX of the Sign Code enumerates a lengthy list of acceptable design standards for "the design of all signs, unless specifically set forth differently in this Schedule."  Pole signs are not included in that chapter.  This despite the fact that "pole signs" are defined in Chapter IV of the Sign Code.  Chapter XIV prohibits any signs not in compliance with the standards set forth in the rest of the Sign Code, including Chapter IX's design standards.  Perhaps recognizing that pole signs are not authorized and

9

it has not specifically challenged this aspect of the Sign Code, Palmetto attempts to fallback on the so-called catchall provision. Nevertheless, that provision similarly does not provide authorization for the construction of pole signs. That provisions reads, "[s]igns that are specifically . . . defined . . . and/or otherwise authorized by this schedule shall be permitted as set forth herein." (Sign Code Ch. V(D), D.E. 1 at 71.) While pole signs are defined, they are not permitted as set forth in the rest of the Sign Code. It cannot be that Chapter V(D) of the Sign Code permits any sign type that is merely defined in the regulations. Instead, it is simply a "general statement," as it purports, no more and no less. Palmetto does not challenge the Sign Code's exclusion of pole signs in his Complaint. The Complaint's generic statement that Palmetto challenges "any other provision which was or could have been used to deny the Applications," is insufficient as a matter of law. Rather, it is a vague and transparent attempt to satisfy the redressability concerns outlined by numerous decisions in the Eleventh Circuit and this District. There is no explanation as to how such a general statement could provide Miami Gardens with any notice of exactly what provisions of the Sign Code were being challenged. It also forces the Court to divine what exactly Palmetto might be challenging from the labyrinth of Miami Gardens' Sign Code regulations. Therefore, even if Palmetto was successful in its challenges to the Billboard Ban, Miami Gardens' application of the standards for monument, wall, and window signs, the exemption of certain signs from permitting requirements, the sign plan requirement, the lack of procedural safeguards, the lack of time limits for permit approval, and Miami Gardens'

legislative actions in adopting the Billboard Ban, Palmetto's injuries would still not be redressed as the type and design of sign is prohibited under the Sign Code and Palmetto does not specifically challenge this regulation. Accordingly it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant's Motion to Dismiss Plaintiff's Complaint (D.E. 6), filed on October 15, 2009, is **GRANTED**;

2. Plaintiff's Complaint is **DISMISSED** for lack of standing;

3. This case is now **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of September, 2010.

*Joan A. Lenard*
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

11